IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| UNITED STATES OF AMERICA | * |
|---|---|
| | * |
| v. | * Case No. 13-po-01557 |
| | * |
| CEDRIC S. BROWN | * |
| | * |
| Defendant | * |

## MEMORANDUM OPINION AND ORDER

In *Missouri v. McNeely,* 569 U.S. ---, 133 S.Ct. 1552 (2013) the Supreme Court held that the natural dissipation of alcohol in the bloodstream does not establish a *per se* exigency that suffices on its own to justify an exception to the Fourth Amendment's warrant requirement for nonconsensual blood testing in all drunk-driving cases. Rather, that exigency must be determined case by case based on the totality of the circumstances. *McNeely,* 133 S.Ct. at 1556. The Supreme Court issued its decision on April 17, 2013. Three questions are presented in this case:

1. Should the decision in *McNeely* be applied retroactively to the facts of this case?

2. Did the taking of the defendant's blood for testing constitute a violation of his Fourth Amendment rights?

3. If there was a violation of the defendant's Fourth Amendment rights, should the results of the blood test be excluded at trial?

FACTS

On November 21, 2012 at 11:02 p.m., U.S. Park Police Officer Lisa Marie Weisbaum was patrolling the Baltimore-Washington Parkway, a federal highway located in the State of Maryland and within the special maritime and territorial jurisdiction of the United States. Officer Weisbaum noticed a blue Dodge Intrepid traveling ahead of her in the left lane. She observed the vehicle cross over the white fog line separating the left travel lane and the shoulder, and then swerve back into the left lane. Her radar unit indicated that the vehicle was travelling 72 mph in a 55 mph zone. Officer Weisbaum activated her emergency equipment and stopped the vehicle. She found the defendant to be the driver and sole occupant. Officer Weisbaum detected an odor of alcohol coming from the vehicle. She also noticed that the defendant's eyes were red, bloodshot and watery. In response to the officer's questions, the defendant stated that he did not have anything to drink, that he was coming from work, and was on his way home. Officer Weisbaum then asked the defendant to step out of the vehicle so that she could administer field sobriety tests. Once outside the vehicle, the defendant had difficulty standing and had to use his car for support. He nearly stumbled into the travel lane. Officer Weisbaum detected the odor of alcohol coming from the defendant's person once he was outside of the vehicle. Because of the close proximity of the defendant's car to the travel portion of the highway and the defendant's instability, Officer Weisbaum administered just one field sobriety test – the horizontal gaze nystagmus test. The defendant's performance on that test along with her other observations led Officer Weisbaum to believe that the defendant was under the influence of alcohol. She then administered a preliminary breath test at the scene. The result was a .16 grams of alcohol per 210 liters of breath. Officer Weisbaum then placed the defendant

under arrest and placed him in the back of her police cruiser. An inventory search of the defendant's car at the scene revealed an open container of beer in the center console.

Officer Weisbaum then transported the defendant to the police station. She advised him that she was taking him to the station for processing and to administer a breath test. They arrived at the police station at 11:35 p.m. There, Officer Weisbaum observed the defendant for 20 minutes, which is required procedure prior to the administration of the breath test. This observation period is necessary to assure the accuracy of the breath test results. During the observation period Officer Weisbaum observed the defendant for any coughing, belching, hiccupping – all factors which could influence the breath test results. While Officer Weisbaum was observing the defendant in preparation of the breath test, another officer engaged the defendant in the booking process. At the conclusion of the observation period, Officer Weisbaum administered the breath test using an Intoximeter unit. Two attempts were made, but the defendant did not provide a sufficient breath sample on either one. Officer Weisbaum believed that the defendant could provide a sufficient sample because he had done so at the scene of the traffic stop when she administered the preliminary breath test. She concluded that the defendant's failure to provide a sufficient sample was intentional and for the purpose of delay.

In accordance with standard U.S. Park Police procedures, Officer Weisbaum sought permission from a supervising officer to transport the defendant to the hospital for a blood draw. After she obtained that permission, Officer Weisbaum advised the defendant that since he did not give a sufficient sample for the breath test, she was going to transport him to the hospital for a blood draw. The defendant advised her that he would not consent to a blood draw. Officer Weisbaum then transported the defendant to the hospital for a blood draw, which was accomplished without incident. Officer Weisbaum estimated that the blood draw was delayed

approximately 30 minutes due to the defendant's failure to cooperate in the administration of the breath test at the station. The defendant was subsequently issued violation notices for several misdemeanors including (1) driving under the influence of alcohol and/or drugs, in violation of 36 C.F.R. §4.23(a)(1); (2) driving with an alcohol concentration in the operator's blood or breath of 0.08 grams or more of alcohol per 100 milliliters of blood or 0.08 grams or more of alcohol per 210 liters of breath, in violation of 36 C.F.R. §4.23(a)(2); and (3) refusal to submit to a chemical test for alcohol, in violation of 36 C.F.R. §4.23(c)(2).

At a suppression hearing, Officer Weisbaum testified that she did not attempt to obtain a warrant prior to taking the defendant to the hospital for the blood draw because she did not believe she was legally required to do so. It was her understanding of the applicable implied consent law that a DWI suspect did not have the right to refuse to submit to a chemical test to determine blood-alcohol content. She testified that in the event of a refusal, U.S. Park Police procedures provided that the suspect could be transported to a hospital for a nonconsensual blood draw if a supervising officer first gave permission. She testified that she had never obtained a warrant in the past under these circumstances and that she followed the standard procedure in this case.

Detective Jose Bumbry of the U.S. Park Police confirmed that it was not the policy of the U.S. Park Police to obtain a warrant prior to the nonconsensual taking of a DWI suspect's blood. He also testified about the procedure developed between the U.S. Park Police and United States Attorney's Office in regard to obtaining a search and seizure warrant during non-business hours. He testified that the procedure could take from five to nine hours. Sergeant Anthony Giannino of the U.S. Park Police testified that on April 17, 2013, after being notified of the *McNeely* decision, he contacted the chief United States Magistrate Judge in an effort to devise an

expedited procedure to obtain warrants for blood draws.  During the course of that same day, Sergeant Giannino and the chief Magistrate Judge devised such a procedure.  In fact, the new procedure was first used later that same night.  Since the new procedure was implemented, approximately 20 warrants for blood draws have been applied for and none have been declined.

## RETROACTIVITY OF *MCNEELY*

As a general rule, a decision of the Supreme Court construing the Fourth Amendment is to be applied retroactively to all convictions that were not yet final at the time the decision was rendered.  *United States v. Johnson,* 457 U.S. 537, 562 (1982); *see also Griffith v. Kentucky,* 479 U.S. 314, 324 (1987).  In *Johnson,* the Supreme Court held that the Fourth Amendment ruling announced in *Payton v. New York,* 100 S.Ct. 1371 (1980), prohibiting police from making a warrantless, nonconsensual entry into a suspect's home for the purpose of making a routine felony arrest, applied retroactively to a case pending on direct appeal.  *Johnson*, 457 U.S. at 554-55.  Recently, in *Davis v. United States,* 131 S.Ct. 2419 (2011), the Supreme Court applied its decision in *Arizona v. Gant,* 129 S.Ct. 1710 (2009), governing the warrantless search of an automobile incident to the arrest of its occupants, retroactively to a case pending on direct appeal.  The present case falls in line with this Supreme Court precedent.  The Court finds, therefore, that the decision in *McNeely* applies retroactively to the present case.

## FOURTH AMENDMENT VIOLATION

The Fourth Amendment provides  "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized".  In *Schmerber v. California*, 384 U.S. 757, 766-72 (1966), the Supreme Court recognized that the

drawing of an individual's blood for evidentiary purposes implicates the Fourth Amendment, requiring that a warrant be obtained. Over the years, the Supreme Court has carved out exceptions to the Fourth Amendment's warrant requirement, finding that in certain circumstances, a search and/or seizure is reasonable even when conducted without a warrant. Arguably, two of these exceptions apply to this case.

## Consent

A search conducted pursuant to the valid consent of the individual is a well- recognized exception to the Fourth Amendment's warrant requirement. *Schneckloth v. Bustamonte,* 412 U.S. 218 (1973). Under this exception, the court must determine, based upon the totality of the circumstances, whether consent was knowing and voluntary. *United States v. Mendenhall,* 446 U.S. 544, 557 (1980). Officer Weisbaum testified that when she advised the defendant that she was going to take him to the hospital for a blood draw because he would not give a sufficient breath sample, he explicitly refused to consent to the blood draw. Clearly, therefore, the warrantless blood draw cannot be upheld under the consent exception. [1]

## Exigent Circumstances

The government asserts that there are exigent circumstances in this case which excused Officer Weisbaum from obtaining a warrant prior to the taking of the defendant's blood sample. Over the years, the Supreme Court has recognized an "exigent circumstances exception" to the Fourth Amendment's warrant requirement which applies 'when the exigencies of the situation' make the needs of law enforcement so compelling that a warrantless search is objectively reasonable under the Fourth Amendment. *Kentucky v. King,* 131 S.Ct. 1849, 1856 (2011) *citing*

---

[1] The Government does not argue that the defendant's consent to the blood draw was derived from the implied consent law. Assuming arguendo that consent to the blood draw could be derived from the implied consent law, it is clear that the defendant withdrew that consent. *See McNeely,* 133 S.Ct. at 1566 recognizing that "[implied consent] laws impose significant consequences when a motorist withdraws consent".

*Mincey v. Arizona*, 437 U.S. 385, 394 (1978). The Supreme Court has found such exigent circumstances in situations involving an officer entering a home without a warrant to render assistance to an injured occupant or to protect an occupant from imminent injury, *see Brigham City v. Stuart,* 436 U.S. 499 (2006), warrantless entry into a burning building, *see Michigan v. Tyler,* 436 U.S. 499 (1978), and warrantless entry into a house to arrest the robber and search for weapons based on probable cause to believe that an armed robber had entered the house a few minutes prior to entry. *See Warden v. Hayden,* 87 S.Ct. 1642 (1967). Significantly, for the purposes of this case, the Supreme Court has also applied the exigent circumstances exception in cases where the police acted without a warrant to prevent the imminent destruction of evidence. *See Ker v. California,* 473 U.S. 23 (1963).

The analysis of this issue begins with the Supreme Court's decision in *Schmerber.* In *Schmerber,* the defendant was charged with driving an automobile while under the influence of intoxicating liquor. He was arrested at the hospital where he was being treated for injuries sustained in an accident involving the vehicle he had been driving. At the direction of the police officer, a sample of the defendant's blood was taken by a physician at the hospital. A chemical analysis of the blood sample revealed an amount of alcohol in his blood at the time of the offense which indicated intoxication. At trial, the defendant objected to the admission of the blood test results on the ground that the blood had been withdrawn despite his refusal to consent to the test. The defendant raised several arguments, including violation of his Fourth Amendment rights. His arguments were rejected by the Appellate Department of the California Superior Court which affirmed his conviction.

The Supreme Court also affirmed his conviction. Justice Brennan, writing for the majority, noted that a search warrant would ordinarily be required for an intrusion into the

human body, such as the withdrawal of a person's blood. *Schmerber,* 384 U.S. at 769. He carved out an exception, however, where the police officer might reasonably believe he was confronted with an emergency, in which the delay necessary to obtain a warrant, under the circumstances, threatened the destruction of evidence. *Id. citing Preston v. United States,* 376 U.S. 364 (1964). Significantly, Justice Brennan wrote

> We are told that the percentage of alcohol in the blood begins to diminish shortly after drinking stops, as the body functions to eliminate it from the system. Particularly in a case such as this where time had to be taken to bring the accused to a hospital and to investigate the scene of the accident, there was no time to seek out a magistrate and secure a warrant. Given these *special facts*, we conclude that the attempt to secure evidence of blood-alcohol content in this case was appropriate incident to petitioner's arrest.

*Schmerber,* 384 U.S. at 770-71 (emphasis added). Justice Brennan concluded, therefore, that there was no Fourth Amendment violation. He cautioned, however, that "we reach this judgment only on the facts of the present record." *Id.* at 772.[2]

Since *Schmerber* was decided in 1966, courts have differed in the interpretation of its holding. Some jurisdictions have interpreted the decision in *Schmerber* broadly as holding that the natural dissipation of alcohol in the bloodstream established a *per se* exigency that sufficed on its own to justify an exception to the warrant requirement for the nonconsensual blood testing in drunk driving cases. Other jurisdictions afforded the decision a more limited interpretation. In an effort to resolve this split of authority, the Supreme Court granted certiorari in *McNeely*. *McNeely*, 133 S.Ct. at 1558 n.2.

In *McNeely,* on October 3, 2010 at 2:08 a.m., Corporal Mark Winder, a Missouri state highway patrolman, stopped the truck which Tyler McNeely was driving for speeding and

---

[2] Although *Schmerber* recognized the exception to the warrant requirement in terms of a search incident to an arrest, it has been widely considered as an application of the exigent circumstances exception. *See United States v. Berry,* 866 F.2d 887, 891 (6th Cir. 1989)

8

repeatedly crossing the centerline. Corporal Winder observed signs of intoxication – bloodshot eyes, slurred speech, and the smell of alcohol on McNeely's breath. McNeely admitted that he had consumed "a couple of beers" at a bar. He was unsteady on his feet as he exited the truck. Corporal Winder asked McNeely to perform standard field-sobriety tests. McNeely performed poorly on the tests. McNeely declined to use a portable breath-test device to measure his blood-alcohol concentration. Corporal Winder then placed McNeely under arrest for driving while intoxicated. *McNeely*, 133 S.Ct. at 1556-57.

On the way to the police station, McNeely advised again that he would refuse to provide a breath sample. The officer thereupon changed course and transported McNeely to a nearby hospital for blood testing. At no time did Corporal Winder attempt to secure a warrant. At the hospital, the officer asked McNeely whether he would consent to a blood test. The officer, reading from the implied consent form, advised McNeely that under state law refusal to submit voluntarily to the test would lead to the immediate revocation of his driver's license for one year and could be used against him at trial. McNeely refused to consent. The officer then directed a hospital lab technician to take a blood sample. The sample was collected at 2:35 a.m. Subsequent laboratory testing measured McNeely's blood-alcohol concentration at 0.154 percent, above the legal limit in Missouri of 0.08 percent. *Id*. at 1557.

Corporal Winder testified at trial that he did not attempt to secure a warrant because he believed that it was not legally necessary to obtain a warrant. He testified that in his more than 17 years of experience, he had obtained warrants when he wanted to test the blood of DWI suspects. He testified that he was "sure" that a prosecuting attorney was on call and had no reason to believe that a magistrate judge would have been unavailable. On this occasion, however, he did not even attempt to obtain a warrant because he believed that a recent change in

9

Missouri's implied consent law obviated the need for officers to obtain a warrant before requiring DWI suspects to submit to nonconsensual blood tests. *McNeely,* 133 S.Ct. at 1567.

At trial, McNeely moved to suppress the results of the blood test, arguing that the taking of his blood for testing without a warrant violated his rights under the Fourth Amendment. The trial court agreed with McNeely. On appeal, the Supreme Court of Missouri affirmed the decision of the trial court to suppress the results of the blood test. *State v. McNeely,* 358 S.W.3d. 65 (Mo. banc 2012). Relying on the Supreme Court's holding in *Schmerber,* the Supreme Court of Missouri concluded that McNeely's case was a routine DWI case, absent of any exigent circumstances which would allow a nonconsensual, warrantless blood draw. It held that the sole special fact that blood-alcohol levels dissipate after drinking ceases is not a *per se* exigency pursuant to *Schmerber* justifying an officer to order a blood test without obtaining a warrant from a neutral judge. *Id*. at 67. The Supreme Court of Missouri noted that the State could still proceed with the prosecution of McNeely based on other properly obtained evidence, but the results of the blood test would be suppressed. *Id*.

The United States Supreme Court affirmed the decision of the Supreme Court of Missouri. Writing for the majority, Justice Sotomayor held that in drunk-driving investigations, the natural dissipation of alcohol in the bloodstream does not constitute an exigency in every case sufficient to justify conducting a blood test without a warrant. *McNeely,* 133 S.Ct. at 1568. Further, she held that the exigency must be determined case by case based on the totality of the circumstances. *Id*. In making its ruling, the Supreme Court clarified its prior decision in *Schmerber*. It held, in essence, that the natural metabolization of alcohol from the bloodstream does not present a *per se* exigency that will justify the nonconsensual taking of blood without a warrant in DWI cases. The natural metabolization of alcohol from the bloodstream may be one

of the "special facts" recognized in *Schmerber* constituting the exigent circumstances necessary to uphold the validity of a nonconsensual, warrantless taking of blood in a DWI case. That fact, however, is not sufficient alone; additional "special facts" are required.

The government asserts that this case falls within the exigent circumstances exception. Specifically, it points to the 30 minute delay in the taking of the defendant's blood due to the defendant's failure to cooperate with the breath test at the station. The Court does not find that said delay combined with the natural dissipation of blood-alcohol brings this case within the exigent circumstances exception. This is simply not a case where the exigencies of the situation were so compelling to excuse the need for a warrant. Officer Weisbaum described this incident as a "routine" DWI stop. While this alone does not mean a warrant is required, it is a "special fact" to be considered. *See McNeely*, 133 S.Ct. at 1568. Additionally, unlike *Schmerber,* time did not have to be taken to investigate an accident or attend to the suspect's personal injuries. There was nothing about the defendant's physical or mental condition, or behavior, which required the expenditure of time in addition to what would normally be expended in a routine DWI stop. Officer Weisbaum testified that it is common for defendants to at first agree to cooperate with the breath test and then not blow sufficiently, resulting in a failed test. The Court does not find that the totality of the circumstances present in this case constitute such an emergency to excuse the officer from obtaining a warrant prior to the taking of the defendant's blood. Given that the defendant did not consent to the blood test, the Court finds the taking of his blood was in violation of the Fourth Amendment.

## EXCLUSIONARY RULE

As a final matter, the Court must determine whether or not the results of the blood test should be suppressed at trial. Although the Fourth Amendment protects people against

unreasonable searches and seizures, the Amendment "contains no provision expressly precluding the use of evidence obtained in violation of its commands." *Arizona v. Evans,* 514 U.S. 1, 9 (1995). Nonetheless, the decisions of the Supreme Court have established an exclusionary rule that, when applicable, forbids the use of improperly obtained evidence at trial. *Herring v. United States,* 555 U.S. 135, 139 (2009). The sole purpose of the exclusionary rule is to deter future Fourth Amendment violations. *Davis v. United States,* 131 S.Ct. 2419, 2426 (2011). However, the exclusion of evidence does not automatically follow from the fact that a Fourth Amendment violation occurred. *Id*. at 2431. In fact, the Supreme Court has noted that the exclusionary rule should not be applied when evidence is obtained as a result of nonculpable, innocent police conduct, although in violation of Fourth Amendment rights. *Id.* at 2429.

The Supreme Court recognized in *Davis* that as late as 1971 the application of the exclusionary rule was virtually automatic where a Fourth Amendment violation occurred. Over time, however, the Supreme Court "abandoned the old 'reflexive' application of the doctrine, and imposed a more rigorous weighing of its costs and deterrence benefits". *Davis,* 131 S.Ct. at 2427. "For exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." *Id*. The Court discussed the price society pays when evidence is excluded. It noted

> Exclusion exacts a heavy toll on both the judicial system and society at large…It almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence… And its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment.

*Id*. (citations omitted).

The Supreme Court also discussed the deterrence benefits of exclusion. It noted:

> the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue….When the police

> exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for
> Fourth Amendment rights, the deterrent value of exclusion is
> strong and tends to outweigh the resulting costs….But when
> the police act with an objectively 'reasonable good-faith belief'
> that their conduct is lawful,… or when their conduct involves
> only simple, 'isolated' negligence,… the 'deterrence rationale loses
> much of its force,' and exclusion cannot 'pay its way.'

*Davis,* 131 S.Ct. at 2427-28 (internal citations omitted)

In *Davis*, the Supreme Court applied the good faith exception to the exclusionary rule and affirmed the defendant's conviction. It noted that although the evidence was seized in violation of the defendant's Fourth Amendment rights, at the time of the seizure the police were acting in strict compliance with binding judicial precedent. The Court held "searches conducted in objectively reasonable reliance on binding appellate precedent are not subject to the exclusionary rule." *Id*. at 2423-24.

The Supreme Court has applied this "good-faith" exception in a wide range of cases. *See United States v. Leon,* 468 U.S. 897 (1984) (exclusionary rule does not apply when the police conduct a search in objectively reasonable reliance on a warrant later held invalid); *Illinois v. Krull*, 480 U.S. 340 (1987) (good-faith exception extended to searches conducted in reasonable reliance on a subsequently invalidated statute); *Arizona v. Evans*, 514 U.S. 1 (1995) (good-faith exception applied where police reasonably relied on erroneous information concerning an arrest warrant in a database maintained by judicial employees); *Herring v. United States*, 555 U.S. 135 (2009)(*Evans* extended to a case where police employees erred in maintaining records in a warrant database).

The facts of this case differ significantly with the facts of those cases where the Supreme Court has applied the good-faith exception to the exclusionary rule. Officer Weisbaum did not base her decision to compel the blood draw without a warrant on any erroneous information.

13

She did not rely on any statute which was subsequently invalidated. She did not rely on any binding judicial precedent. Nevertheless, the government urges this Court to apply the good-faith exception to the exclusionary rule in this case. It argues that Officer Weisbaum acted in good faith and in accordance with U.S. Park Police procedures and the law as she understood them in directing the drawing of the defendant's blood without first obtaining a warrant. As such, the government asserts that this is the type of "nonculpable, innocent police conduct" mentioned in *Davis* to which the good-faith exception should apply.

Traffic offenses occurring on the Baltimore – Washington Parkway are governed by 36 C.F.R. §§4.1 *et seq*. Section 4.23 addresses alcohol and/or drug related driving offenses. Subsection (c) provides that if a police officer has probable cause to believe that the operator of a vehicle is driving under the influence of alcohol and/or drugs, "the operator shall submit to one or more tests of the blood, breath, saliva or urine for the purpose of determining blood-alcohol and drug content if directed or requested to do so by the officer." This regulation does not require that the officer first obtain a warrant before directing the testing of the operator's blood, breath, saliva or urine. It does not require the existence of exigent circumstances. Further, it does not require the operator's express consent. In fact, subsection (c)(2) provides that the refusal by the operator to submit to a test is prohibited and that proof of refusal may be admissible in any related judicial proceeding.

The provisions of the federal implied consent law, 18 U.S.C. §3118, also apply in this case. That statute provides:

> [w]hoever operates a motor vehicle in the special maritime and
> territorial jurisdiction of the United States consents thereby to a
> chemical test or tests of such person's blood, breath, or urine, if
> arrested for any offense arising from such person's driving while
> under the influence of a drug or alcohol in such jurisdiction . . .
> The test or tests shall be administered upon the request of a police

14

> officer having reasonable grounds to believe the person arrested to
> have been driving a motor vehicle… while under the influence of
> drugs or alcohol in violation of the laws of a State, territory,
> possession, or district.

Subsection b of the statute also provides for sanctions in the event a person refuses a test:

> [w]hoever…refuses to submit to such a test or tests, after having
> first been advised of the consequences of such refusal, shall be
> denied the privilege of operating a motor vehicle upon the special
> maritime and territorial jurisdiction of the United States during the
> period of a year commencing on the date of arrest …and such
> refusal may be admitted into evidence….

Like 36 C.F.R. §4.23, the implied consent law does not require the officer to first obtain a warrant before directing the testing of the individual's blood, breath or urine; nor does it require the driver's express consent or the existence of exigent circumstances.

The problem with the government's argument on this point is that the relevant facts in *McNeely* were not materially different from the facts of this case, and neither the Supreme Court of Missouri nor the Supreme Court of the United States applied the good-faith exception to save the blood test results from exclusion. Like Officer Weisbaum, Corporal Winder testified that he did not obtain a warrant before directing that McNeely's blood be drawn because he believed it was not legally necessary to do so. A change in Missouri's implied consent law prior to McNeely's arrest led Corporal Winder to that conclusion. The prior implied consent law in Missouri provided that if a person refused to submit to a test, "none shall be given." Section 577.041.1, RSMo. Supp. 2008. The law was amended prior to McNeely's arrest by the deletion of the phrase "none shall be given." Section 577.041.1, RSMo. Supp. 2010. A law enforcement officer in Missouri could easily conclude from the deletion of that phrase that upon refusal he or she could require the testing of a DWI suspect's blood without consent and without a warrant. Nevertheless, the trial court in *McNeely* suppressed the results of the blood test, finding that the

nonconsensual and warrantless blood draw was a violation of his Fourth Amendment rights. On review, both the Supreme Court of Missouri and the Supreme Court of the United States affirmed. None of these courts applied the good-faith exception to the exclusionary rule to save the blood test from exclusion at trial. Since the relevant facts of this case do not materially differ from those in *McNeely* on this issue, this Court must reach the same conclusion.

The government also asserts that Officer Weisbaum could have reasonably believed that the natural dissipation of blood-alcohol constituted an exigency that dispensed with the warrant requirement. Here, the government highlights cases from various jurisdictions which misinterpreted *Schmerber* as holding that in a DWI case, a warrant need not be obtained prior to taking the blood of a suspect who refuses to consent. The government fails to recognize, however, that courts in many other jurisdictions have interpreted the holding in *Schmerber* correctly, holding that the natural dissipation of blood-alcohol was only one of the "special facts" upon which a finding of exigent circumstances could be based. Indeed, the Supreme Court recognized this split of authority and sought to resolve it by granting certiorari in *McNeely*. *McNeely,* 133 S.Ct. at 1558. Significantly, there is no binding judicial authority in the Fourth Circuit which holds that the natural dissipation of blood-alcohol presents a *per se* exigency justifying the nonconsensual, warrantless taking of a DWI suspects blood. As Justice Sotomayor stated in her concurring opinion in *Davis:* "when police decide to conduct a search or seizure in the absence of case law (or other authority) specifically sanctioning such action, exclusion of the evidence obtained may deter Fourth Amendment violations…" *Davis*, 131 S.Ct. at 2435 (Sotomayor, J. concurring).

Finally, the government argues that there is nothing to deter by suppression because procedures were adopted after *McNeely* was decided to safeguard the Fourth Amendment rights

16

of DWI suspects. Indeed, Sergeant Giannino testified that on the same day that the decision in *McNeely* was issued, a new policy was implemented pursuant to which an attempt to obtain a warrant would be made before the taking of a DWI suspect's blood. The new procedure was first utilized later the same night. He further testified that since the new procedure has been implemented, warrants have been requested in approximately 20 cases, and none have been declined. On this basis, the government argues that suppression of the defendant's blood test will not serve to deter future Fourth Amendment violations because the new procedure implemented in response to the *McNeely* decision will assure that future Fourth Amendment violations will be curtailed.

In support of its position, the government relies on the Fourth Cicuit case of *United States v. Johnson,* 410 F.3d 137 (4th Cir. 2005). In *Johnson,* the defendant was the driver of a car involved in an accident on the Baltimore-Washington Parkway. When the police arrived at the scene, the defendant was conscious but unresponsive. Suspecting that the defendant may be under the influence of an illegal substance, the police transported the defendant to the hospital for a blood draw. Pursuant to a contract between the United States Park Police and the Army's Armed Forces Institute of Pathology, the toxicology analysis of the defendant's blood was performed at the Institute. The defendant's blood tested positive for PCP and a derivative of marijuana.

The defendant moved to suppress the results of the blood test on the ground that it was performed at the Armed Forces Institute in violation of the prohibition on military intervention in civilian law enforcement codified in the Posse Comitatus Act, 18 U.S.C. §1385. The district court denied the motion to suppress. On appeal, the Fourth Circuit affirmed. Although the Fourth Circuit could not find that the Act had been violated because the record did not establish

that military personnel actually performed the blood test, it noted that even if it had found a violation of the Act, it would still affirm the district court's denial of the motion to suppress. The Court stated that as a general matter, the exclusionary rule is not a remedy for violations of the Act. It went on to state that should there be evidence of widespread and repeated violations of the Act, then it would consider applying the exclusionary rule in the future. *Johnson,* 410 F.3d at 149.

The government's reliance on *Johnson* is misplaced. The defendant in *Johnson* did not contend that his *blood* was taken in violation of his Fourth Amendment rights,[3] but rather violated the prohibition on military intervention in civilian law codified in the Posse Comitatus Act, 18 U.S.C. § 1385 (2000). As such, the Fourth Circuit did not review his request for suppression of his blood test in the context of a Fourth Amendment violation. If it had, the Fourth Circuit would likely have found no Fourth Amendment violation based on the exigent circumstances created by the accident and the defendant's physical and mental condition at the time. *Johnson*, 410 F.3d at 141-42. It would not have had to even consider the good-faith exception to the exclusionary rule. Further, while the exclusionary rule may not be a remedy for a violation of the Posse Comitatus Act as a general matter, it is well established that it is a remedy for a Fourth Amendment violation.

In all of the cases where courts have applied the good-faith exception to the exclusionary rule to save evidence obtained in violation of the Fourth Amendment from exclusion, the focus of attention has been on the information or authority relied upon by law enforcement prior to and at the time of the warrantless search or seizure. The Court is not aware of any case where the good-faith exception has been applied on the basis of *ex post facto*

---

[3] Johnson did assert that the warrantless search of his glove compartment violated his Fourth Amendment rights but that issue is not relevant here.

remedial procedures implemented by law enforcement designed to curtail future Fourth Amendment violations.

In summary, the Court finds that the holding in *McNeely* applies retroactively to the facts of this case. The Court further finds that the defendant's blood was taken without his consent and that the government has not established exigent circumstances which would justify the taking of the defendant's blood without a warrant. Therefore, the Court finds that the taking of the defendant's blood in this case was in violation of his Fourth Amendment rights. Finally, the government has not established that the good-faith exception to the exclusionary rule should be applied in this case. The defendant's motion to suppress the results of the blood test is, therefore, granted.

Date: October 11, 2013 /s/
Thomas M. DiGirolamo
United States Magistrate Judge